**The PEOPLE of the State of Colorado, Complainant,**

v.

**Robert Melvin HOHERTZ, Attorney–Respondent.**

**No. 96SA308.**

Supreme Court of Colorado, En Banc.

Oct. 28, 1996.

Linda Donnelly, Disciplinary Counsel, James C. Coyle, Assistant Disciplinary Counsel, Denver, for Complainant.

Michael D. Gross, Colorado Springs, for Attorney–Respondent.

PER CURIAM.

The assistant disciplinary counsel and the respondent, Robert Melvin Hohertz, execut-ed a stipulation, agreement, and conditional admission of misconduct. C.R.C.P. 241.18. The parties agreed in the conditional admission to the imposition of suspension from the practice of law in the range of two to three years. An inquiry panel of the supreme court grievance committee approved the conditional admission, with the recommendation that the respondent be suspended for three years. We accept the conditional admission and the inquiry panel's recommendation.

I

The respondent was admitted to the Colorado Bar in 1984. The respondent stipulated to the following facts and disciplinary violations.

A

Donald D. Evans and Linda Sue Dutoit were divorced in 1983. Dutoit, who lives in Seattle, Washington, was granted custody of their two children, David and Lisa. Evans, who lives in Colorado Springs, Colorado, retained the respondent in December 1993 to secure a change of custody for David.

At their initial meeting the respondent told Evans that because David was almost seventeen, David's choice of which parent to live with would be a relevant factor in the change of custody proceedings. In view of the fact that David would become seventeen in the summer of 1994, when he and Lisa were scheduled to visit Evans, the respondent and Evans agreed to delay the initiation of the change of custody proceedings until that period of time. The respondent ultimately filed a motion for change of custody on August 5, 1994. However, the respondent did not send Evans a copy of the motion or otherwise inform Evans that the motion had been filed.

The children were scheduled to return to Dutoit's home in Seattle on August 27, 1994. Before that date, David informed Dutoit that he would not be returning. On August 26, 1994, Dutoit, through local counsel, filed an ex parte motion seeking an order to enforce the return scheduled for the next day. That same day the trial court entered an order requiring David to return to his mother and Evans was served with a copy of the order.

When Evans consulted the respondent, the respondent told him that the order was "ludicrous" because a boy David's age should have the right to decide where he wanted to be. David did not return to Seattle on August 27.

The respondent called Evans on August 28 and told him that he was filing papers to preclude any further motions or orders regarding David's return to Seattle. The following day the respondent sent his client a letter confirming several suggestions to assist Evans "in cementing your son's stay in Colorado Springs." Also on August 29, Evans was served with another court order, this time directing the sheriff's department to escort David to a flight back to Seattle. David did return to Seattle.

Through her local lawyer, Dutoit filed a motion requesting the issuance of a contempt citation against Evans and seeking costs and attorney fees associated with the measures taken to secure David's return. The hearing on the contempt citation was scheduled for December 1994. Prior to the hearing, the lawyers met in chambers and the respondent entered into an agreement requiring Evans to pay $1,136 in fees and providing that the contempt citation would be held in abeyance for a period of one year. However, the respondent did not have his client's authority to enter into this agreement. Evans discharged the respondent in January 1995 and hired a new lawyer. All of the custody and contempt issues were subsequently resolved.

As the respondent admits, the foregoing conduct violated R.P.C. 1.1 (failure to provide competent representation to a client), R.P.C. 1.4(a) (failure to keep a client reasonably informed about the status of a matter), and R.P.C. 8.4(d) (engaging in conduct that is prejudicial to the administration of justice).

B

On May 24, 1994, Annette Schmidt hired the respondent to represent her in connection with the dissolution of her common-law marriage. Schmidt initially paid the respondent $1,000 and subsequently paid him an additional $2,000. The respondent also billed Schmidt for an additional amount of approximately $2,200.

When on July 8, 1994, Schmidt appeared for a scheduled hearing, she was informed by court personnel that the hearing had been vacated. The respondent had never notified her of that fact. In February 1995 Schmidt suffered an identical experience with respect to another scheduled hearing.

The respondent performed no discovery during the case, although in the summer of 1994 Schmidt demanded that he send interrogatories to her putative husband. Schmidt also asked the respondent to obtain a deposition from her husband. The respondent issued a notice to take the deposition, but no such deposition was ever taken.

The husband's lawyer did send interrogatories to Schmidt, the responses to which were due on September 12, 1994. Schmidt prepared a draft of answers to the interrogatories, with no assistance from the respondent, and delivered them to the respondent's office. The respondent failed to forward the responses in a timely manner. The respondent did supply partial answers to the interrogatories after the husband's lawyer sent a demand letter, but when the husband's lawyer noted deficiencies in the answers, the respondent did not reply. The husband's lawyer filed a motion to compel on December 13, 1994. When the respondent failed to file any responsive pleading, the trial court entered an order on January 4, 1995, requiring that discovery responses be submitted by January 25. The respondent did not inform Schmidt of these discovery issues.

The respondent failed to comply with the trial court's January 4, 1995, order, and the husband's lawyer filed a motion for sanctions on March 7, 1995. The court ultimately entered an order excluding all of Schmidt's witnesses and exhibits related to the discovery requests and awarding fees and costs to the husband's lawyer. The respondent did not object to the fee affidavit filed by the husband's lawyer, and on July 11, 1995, a judgment was entered against Schmidt for attorney fees in the amount of $1,186.95. The respondent failed to advise Schmidt of the judgment entered against her until she discharged him.

Meanwhile, a special master had been appointed to consider the issue of whether a common-law marriage existed. A hearing on that issue was set for April 25, 1995. The respondent subsequently agreed to reschedule the hearing for May 16, 1995, without consulting Schmidt, even though he knew she planned to be out of town from May 13 to 30. Schmidt learned of the new hearing date on April 24, when she telephoned the respondent. She again told the respondent that she would be out of town on May 16, and the respondent filed a motion to continue the hearing. The motion was denied, and the respondent made no arrangements for Schmidt to testify by telephone at the hearing. The husband did testify, and the special master concluded that no common-law marriage existed. Schmidt hired a new lawyer on August 28, 1995, who filed a motion to set aside the judgment. That motion had not been determined as of the date the conditional admission in this case was executed.

The respondent has stipulated that his conduct violated R.P.C. 1.3 (neglect of a legal matter), R.P.C. 1.4(a) (failure to keep a client reasonably informed), and R.P.C. 1.5(a) (a lawyer shall not charge and collect an unreasonable fee).

### C

On December 26, 1990, James H. Unruh, then sixty-nine years old, retained the respondent to file a dissolution of marriage proceeding. Unruh had not yet resided in Colorado for the requisite length of time, however, and the respondent advised him that he would have to wait to file the action. Unruh paid the respondent $600.

On January 14, 1991, Unruh's wife filed a petition for unlimited separation in Oregon. A hearing with respect to temporary orders was set for February 6, 1991. The respondent spoke with the wife's Oregon lawyer, Ken Baker, about an agreement for temporary orders, and also spoke with another Oregon lawyer, Connie Terwilliger, about the

case. Although Terwilliger expressed interest in serving as Unruh's local counsel, she heard nothing more from the respondent. A stipulation was ultimately negotiated concerning temporary orders and the scheduled February hearing was vacated. A trial date was set for July 25, 1991.

From February 6 to June 12, 1991, Unruh heard nothing from the respondent. Baker sent a letter to the respondent on June 12, 1991, indicating that in view of the fact that no attorney had entered an appearance on behalf of Unruh, a default would be taken on or before the scheduled trial date. Baker also offered a proposed settlement. When the respondent did not reply to the letter, Baker sent him another letter by facsimile transmission stating that if Unruh failed to respond to the proposed separation petition by July 22, a default would be entered. A default was entered in the separation proceeding on July 25, 1991.

On July 26, 1991, Baker received a letter from the respondent, dated July 23, which discussed a possible settlement but which did not refer to the July 25 trial date. On August 1, 1991, Baker sent the respondent a copy of proposed permanent orders to be entered by default and invited the respondent to object within ten days. The respondent did not reply. On September 12, 1991, the trial court issued permanent orders, which orders were unfavorable to Unruh. Unruh subsequently retained Terwilliger to represent him. She filed a motion to set aside the judgment, which motion was denied.

The respondent admits that his conduct violated R.P.C. 1.3 (neglect of a legal matter), R.P.C. 1.4(a) (failure to keep a client reasonably informed), and R.P.C. 1.5(a) (a lawyer shall not charge and collect an unreasonable fee).[1]

### D

In January 1993, a woman living with Michael A. Aguilera gave birth to a daughter.

---

**1.** Because the Rules of Professional Conduct did not become effective until January 1, 1993, they did not apply to the respondent at the time of the respondent's misconduct in the Unruh matter. However, the respondent's conduct violated DR 6–101(A)(3) (a lawyer shall not neglect a legal matter entrusted to the lawyer), and DR 2–106(A) (a lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee).

At the time Aguilera assumed that he was the child's father. Aguilera and the mother terminated their relationship shortly after the child was born.

When the child was one and one-half years old, the mother gave the child and her other children to the children's grandparents. Aguilera, who was then living with his parents, took custody of the child.

■ Aguilera hired the respondent to file an action for adjudication of paternity and for temporary custody. Aguilera was subsequently granted temporary custody of the child. On October 20, 1994, the court entered an order requiring genetic paternity testing. On January 24, 1995, the appropriate social services agency filed a petition for protective supervision.

The results of the genetic test excluded Aguilera as the child's biological father. At a hearing on May 30, 1995, the court ordered the social services agency to investigate the certification of Aguilera's home as a foster home. Aguilera's family then retained a Florida lawyer, Charles Jamieson, to assist the respondent. On June 15, 1995, Jamieson sent the respondent copies of a Colorado statute and a case involving a fact pattern similar to the circumstances surrounding this case. Jamieson urged the respondent to immediately file a third-party petition for custody on Aguilera's behalf. The respondent replied that he was taking a vacation and would do something later.

The social services agency issued a letter on June 21, 1995, indicating that Aguilera's home did not qualify as a foster home. The letter required a response by July 6. Aguilera's mother left a message for the respondent on June 29 that according to representatives of the social services agency the child would be removed on July 7.

On June 30, 1995, the respondent was suspended from the practice of law for a period of three months, effective July 30, 1995. *People v. Hohertz,* 898 P.2d 1068 (Colo.1995). On July 6, 1995, the respondent filed a motion for continued custody and a request for a hearing. He also sent a letter the same day to the social services agency, indicating that Aguilera would be hiring a new lawyer

and asking for an additional twenty days to respond to the June 21 letter. However, the social services agency removed the child from Aguilera's home on July 7, 1995.

The respondent admits that the above described conduct violated R.P.C. 1.3 (neglect of a legal matter).

### E

■ Clyde Wilson Jr. and his wife filed a petition for dissolution of their marriage in July 1992. The case remained inactive for two years. Wilson then retained the respondent in July 1994. On July 20, 1994, Wilson's wife threatened to remove the children from the state. The respondent filed motions to prohibit the removal of the children and for temporary orders. An order was entered and the children were not removed.

A lawyer then entered an appearance on behalf of the wife. A stipulation regarding temporary custody and visitation was reached on August 24, and a more extensive stipulation was agreed to on January 5, 1995. However, the respondent did not file the stipulation with the court in a timely manner.

Meanwhile, commencing on December 24, 1994, Wilson's wife refused to let him visit with the children. Although Wilson called the respondent several times during the next three months, the respondent did not file the stipulation and Wilson could not visit with his children. On April 7, 1995, at Wilson's request, the respondent's secretary filed the stipulation. With the assistance of police authorities Wilson was finally able to visit with his children.

A permanent orders hearing was held on May 22, 1995, and a decree of dissolution was entered. The property issues were resolved at that time, but issues of custody and visitation were continued for further proceedings. The respondent filed a motion for custody evaluation on June 30, 1995—the same day this court entered an order suspending him from the practice of law for three months, commencing July 30. The respondent sent Wilson a letter stating that another lawyer would be handling the case, but the letter did not mention the respondent's suspension. Although the lawyer named in the letter did

enter an appearance in the case, Wilson never retained him and the lawyer ultimately withdrew his appearance.

The foregoing conduct violated R.P.C. 1.3 (neglect of a legal matter) and R.P.C. 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation). The respondent also violated C.R.C.P. 241.21(b) by not notifying Wilson by certified mail of the order of suspension and the respondent's inability to represent him.

## II

■ The conditional admission contains the recommendation that the respondent be suspended for two to three years and that the respondent satisfy several special conditions in the event he seeks reinstatement. The inquiry panel approved the conditional admission with the recommendation of a three-year suspension, with conditions for reinstatement contained therein.

Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992), and in the absence of aggravating or mitigating circumstances, suspension is generally appropriate when "(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client." *Id.* at 4.42.

We suspended the respondent in 1995 for similar misconduct. *People v. Hohertz*, 898 P.2d 1068, 1069–70 (Colo.1995). Because the conduct giving rise to this disciplinary proceeding occurred during the time period the conduct described above occurred, that conduct is properly considered part of a pattern of misconduct, *People v. Silvola*, 915 P.2d 1281, 1284 (Colo.1996), and is an aggravating factor with respect to the issue of appropriate discipline in this case. ABA *Standards* 9.22(c). The respondent also received five letters of admonition from the grievance committee between 1990 and 1996, constituting either previous discipline or a further pattern of misconduct, both of which are aggravating factors. *Id.* at 9.22(a), (c).

The assistant disciplinary counsel indicates that this case contains the same factors in mitigation as in the prior suspension:

> In mitigation, the assistant disciplinary counsel has stipulated that the respondent did not have a selfish motive while committing the misconduct, *id.* at 9.32(b), was experiencing personal or emotional problems, *id.* at 9.32(c), and has exhibited remorse, *id.* at 9.32(*l*). In addition, the respondent's treating physician indicates that the respondent is affected by a mental disability, specifically severe depression and adult attention deficit hyperactivity disorder. *See id.* at 9.32(i) (setting out circumstances under which a mental disability should be considered a factor in mitigation). It is the physician's opinion that the disorders caused the foregoing misconduct, that the respondent's condition is treatable, but will require long term treatment prior to termination of therapy or medication.

*Hohertz*, 898 P.2d at 1070. In view of the seriousness and extent of the present misconduct and the extensive pattern of neglect demonstrated by the prior disciplinary proceedings, a long period of suspension is warranted, at a minimum.

In this case the respondent has agreed to satisfy numerous conditions in connection with any request for reinstatement. Those conditions are reproduced in the Appendix attached to this opinion. We conclude that the imposition of these conditions in addition to a three-year suspension is an appropriate sanction under all the circumstances. *See Hohertz*, 898 P.2d at 1070. Accordingly, we accept the conditional admission and the inquiry panel's recommendations and we suspend the respondent for three years, the longest period of suspension authorized by our rules. C.R.C.P. 241.7(2). Because the respondent was suspended on June 30, 1995, for ethical violations that are part of the same pattern of misconduct that underlies this case, and because the respondent remains suspended under that order and has not been reinstated, we also accept the panel's recommendation that the effective date of the respondent's suspension be June 30, 1995.

## III

It is hereby ordered that Robert Melvin Hohertz be suspended from the practice of law for three years, effective June 30, 1995. It is further ordered that the respondent must comply with C.R.C.P. 241.22(b)-(d) before he may be reinstated. It is also ordered that the respondent demonstrate prior to reinstatement that there are no medical or psychological bases that actually impair his abilities to fulfill his responsibilities as a lawyer. It is further ordered that, prior to reinstatement, the respondent must demonstrate restitution to Annette Schmidt in the amount of $3,200 plus statutory interest from May 24, 1994, and restitution to James Unruh in the amount of $600 plus statutory interest from December 26, 1990. As a further requirement for reinstatement, the respondent must comply with all of the conditions imposed on him in the previous order of suspension, *People v. Hohertz,* 898 P.2d 1068, 1070 (Colo.1995). The respondent must also comply with the conditions contained in the Appendix to this opinion. Finally, it is ordered that the respondent pay the costs of this proceeding in the amount of $53.99, within thirty days after the announcement of this opinion to the Supreme Court Grievance Committee, 600—17th Street, Suite 920–S, Denver, Colorado 80202–5435.

## APPENDIX

### STIPULATION, AGREEMENT, AND ADMISSION OF CONDUCT

. . . .

15. Respondent agrees to the following conditions upon reinstatement:

Mr. Gunnar E. Andersson, 1771 S. 8th Street, Colorado Springs, Colorado 80906(719)635–5578, shall review respondent's legal files and method of handling his case load for a period of two years following respondent's reinstatement to the practice of law. The review procedure shall be as follows:

a) The respondent shall demonstrate the existence of a workable reminder, or "tickler" system, and proof of a dual calendar system, or comparable case monitoring system in his office and shall, by the reports of Mr. Andersson demonstrate that both the reminder system and the dual calendar system, or comparable case-monitoring system, are in existence and operating effectively.

b) A case-load-review meeting shall take place between Mr. Andersson and the respondent on this schedule:

1) First six months: meeting once every two weeks;

2) Next six months: meeting once per month;

3) Second Year: meeting quarterly.

c) At each meeting the following will take place:

1) The respondent will prepare a list of current, active files, which files will be reviewed by Mr. Andersson with the respondent. Mr. Andersson will take steps to verify that the list is complete.

2) Mr. Andersson will make and the respondent will write down specific suggestions necessary to assure that the case load is being properly and professionally handled and that the respondent is progressing in a satisfactory manner following the respondent's reinstatement.

3) Mr. Andersson and the respondent will review the list of suggestions from the previous meeting to be sure that all suggestions for improvement have been implemented and that the respondent has complied with them.

4) Mr. Andersson shall have access to and monitor, to the extent he deems necessary, all financial accounts of the respondent, including personal accounts, in order to assure that no commingling of funds occurs.

d) Within ten days following each meeting, the respondent shall submit to the Office of Disciplinary Counsel a written narrative report of the meeting, which report shall be signed by Mr. Andersson. It is respondent's obligation to ensure that such reports, signed by Mr. Andersson, are timely made.

e) Mr. Andersson shall immediately disclose to the Office of Disciplinary Counsel, 600 17th Street, Suite 510–South, Denver, Colorado 80202, any matters which are uncorrected or which represent significant problems requiring corrective attention. Copies of such correspondences shall be sent to the respondent.

f) Mr. Andersson's fees associated with this monitoring shall be paid by respondent.

g) Respondent agrees that failure to comply with these conditions, including failure to make timely reports, as described hereinabove, shall be cause for immediate suspension of his license, pursuant to the procedure of Rule 241.8, C.R.C.P., notwithstanding those causes listed in Rule 241.8.

16. A licensed psychiatrist of respondent's choice and approved by the Office of Disciplinary Counsel shall monitor respondent's psychiatric and emotional adjustment to the practice of law for a period of three years.

a) Respondent shall meet with the psychiatrist *no less often than* once every week for the first six months. Thereafter, for the following two years, respondent shall meet with the psychiatrist once every month.

b) At the sole discretion and judgment of the psychiatrist, respondent shall be required to meet more frequently, or less frequently should the then-existing facts so warrant.

c) Respondent shall fully cooperate and comply with the psychiatrist's therapy and medication programs.

d) The psychiatrist shall file a report with the Office of Disciplinary Counsel on a quarterly basis. Respondent shall waive confidentiality for the purpose of ¶ 16. It is respondent's obligation to ensure that such reports are timely filed.

e) The psychiatrist shall immediately disclose to the Office of Disciplinary Counsel, 600 17th Street, Suite 510–South, Denver, Colorado 80202, any adverse data which in any fashion might affect respondent's ability to practice law. The psychiatrist shall also immediately disclose any violation of any of these conditions imposed, including any failure by respondent to cooperate and comply with the psychiatrist's directions.

f) The respondent shall execute a written authorization to release medical information throughout this monitoring period, and deliver the same forthwith to the psychiatrist to expedite the reporting requirements set forth herein.

g) Respondent agrees that failure to comply with these conditions, including failure to make timely reports, as described hereinabove, shall be cause for immediate suspension of his license, pursuant to the procedure of Rule 241.8, C.R.C.P., notwithstanding those causes listed in Rule 241.8.